Filed 3/30/22  In re A.H. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | B314058 (Los Angeles County Super. Ct. No. 18CCJP06539) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>L.B.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge.  Reversed with directions.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In these dependency proceedings, L.B. (mother) appeals from a juvenile court order terminating her parental rights over A.H., her four-year-old son, contending the court erred in finding no substantial evidence supported a finding that the parental-benefit exception to adoption applied, in applying improper legal criteria to that determination, and in finding the lack of a complete inquiry under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) to be nonprejudicial. We agree with each contention, and thus reverse with directions to order a further ICWA inquiry.

## BACKGROUND

The family consists of mother, now four-year-old A.H., and D.H. (father), A.H.'s father, who is not a party to the appeal.

Mother called the Department of Children and Family services (DCFS or the department) in October 2018 and asked that the department take custody of then eight-month-old A.H., stating she was homeless and unable to care for him. Mother reported she had no immediate family, and a maternal uncle and paternal relatives did not want to care for the child. When social workers met mother at her motel, she told them A.H. was in the lobby, and began to walk away.

The social workers observed A.H. was healthy, and spoke with mother, who said she was "in a bad situation" and homeless, and could not care for the child. Mother said that father, who

2

suffered from schizophrenia and post-traumatic stress disorder (PTSD), had left a week earlier.

Mother was uninterested in a family shelter where she could stay with A.H., or in any other plan that would keep the child with her, and signed an affidavit "giving consent DCFS custody of my child [A.H.] until I find stable housing and job."

A social worker spoke with the father by phone, who said mother was out to get him and wanted him dead, and he was unable to care for A.H. and did not want to visit him. Father reported that mother had told him she used methamphetamine in the past, and confirmed there were no relatives who were able to care for A.H.

W.H., a paternal aunt who was with father during the call, reported they were both homeless and staying at a motel, and no family member, including mother and father, could care for A.H. A maternal uncle reported the same.

At the detention hearing, the juvenile court detained A.H. and allowed the parents unmonitored visitation for at least two hours twice a week, granting DCFS discretion to liberalize visitation.

In preparation for the jurisdiction/disposition hearing, DCFS reported that A.H. was placed in the foster home of A.V. and W.V. His parents had not visited. The caregiver reported mother did often text to ask after A.H.

DCFS reported that mother said she was living with a friend and working at Macy's, and hoped to save enough money to find a place of her own. Mother was unsure whether A.H. could live with her at the friend's house.

DCFS filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1) based on the parents'

inability to care for A.H. and mother's request to have him removed.[1]

The Indian Child Inquiry Attachment form attached to the petition indicated that an inquiry had been made and that A.H. had "no known Indian ancestry." On October 11, 2018, the parents completed Parental Notification of Indian Status forms, each indicating there was no known Indian ancestry. At the detention hearing, the juvenile court found there was no reason to suspect A.H. had Indian ancestry and ordered the parents to inform their attorneys, DCFS, and the court of any new ICWA-related information.

On March 5, 2019, the court sustained the uncontested petition.

On April 18, 2019, DCFS reported it had provided the parents with housing and shelter referrals, and A.H. had been placed in the home of J.B.

After a contested disposition on April 18, 2019, the court declared A.H. to be a dependent of the court, removed custody from the parents, and ordered family reunification services, unmonitored visitation, with DCFS having discretion to liberalize visitation.

By October 2019, the parents had moved to a single room apartment with a bathroom shared with other tenants, and had obtained a bed for A.H. so that overnight visits could be possible. Father kept a machete by his bed for protection, and earned money by participating in pharmaceutical studies, purchasing an

---

[1] Undesignated statutory references will be to the Welfare and Institutions Code.

4

Xbox game console and new television with his earnings. Mother participated in her court-ordered case plan.

A.H. thrived in the care of and became bonded with J.B., who looked after his sensitive skin needs, took him to visit her family in Hawaii, went with him on local trips to church, playdates, and an aquarium, and participated in his weekly therapy sessions. A.H. looked to her for comfort and encouragement, developed "a healthy and strong attachment" to her, and experienced developmentally appropriate separation anxiety when they were apart. J.B. was committed to providing him with a loving adoptive home if reunification did not occur. A.H. called J.B. caregiver "mama" and called mother "nana."

The parents had two-hour unmonitored visits with A.H. twice a week at a park. The foster family agency (FFA) reported that mother and father were "consistent in attending visits" and behaved appropriately with the child, although J.B. reported the parents would sometimes cancel or end a visit early. DCFS reported that "[v]isits with A[.H.] have been consistent with mother. Mother has had a few cancellations and sees A[.H.] almost every week." The report reflected that mother had 28 visits between March 14, 2019 and September 16, 2019, with two cancelled visits. Both parents admitted A.H. was more attached to father, than mother.

However, A.H. told a social worker that he had visits with "mommy," and during virtual visits said "Hi mommy," and waved to mother. J.B. reported that A.H. was excited about and looked forward to his visits with mother. He enjoyed playing while mother watched him during the virtual video visits, and sometimes J.B. allowed an extension of visit time.

5

DCFS and J.B. reported that mother's visits with A.H. were appropriate despite her financial challenges and the fact that she sometimes did not have money for snacks for him, and called the foster parent for assistance.

At the October 17, 2019, six-month review, the court found the parents' progress in the case plan was insubstantial but ordered that reunification services continue.

DCFS declined to liberalize visitation due to a continued concern about father's mental health, aggressive behavior, and lack of consistency with taking his medication and attending therapy. Father said he had auditory and visual hallucinations, could not sleep, and became irritable and aggressive. Instead of taking his medication, he used alcohol and marijuana to help with his mood. Mother described her relationship with father as "toxic."

Mother and father reported they did not want to have overnight visits with A.H. in their single room housing due to a lack of an appropriate environment there.

Mother visited A.H. almost every week but canceled some visits and declined to make them up. During visits at her residence, mother allowed the child to watch television and play on a tablet.

During the Covid pandemic, mother and father chose to have virtual rather than in-person visits in order to protect A.H. and J.B.'s family. They would sing with and read to the now two-year-old A.H. during the visits, but two hours was too long for either side, and engagement would wane. The visits were eventually shortened to 30 to 40 minutes. Sometimes, mother and father texted J.B. for help when they became frustrated during visits. The parents asked for in-person visits, which J.B.

resisted. She offered more virtual visits, but the parents declined. A.H. was excited to see his parents during the virtual visits.

In October 2020, mother and father both informed a social worker that father had threatened to kill mother with his machete, and father reported he had beaten his case manager for allegedly lying to the social worker about him. Mother and father separated for a while but then resumed their live-in relationship.

On March 10, 2021, the court found the parents' progress in the case plan was insubstantial, terminated reunification services, and ordered mother be allowed in-person, unmonitored visits in a neutral setting.

At a contested permanency hearing on July 8, 2021, mother testified she visited A.H. twice a week: once virtually and once in person. The visits had been unmonitored for the past five weeks and for two weeks in the previous September. She at first made the decision to have virtual rather than in-person visits due to the pandemic. At the start of in-person visits, A.H. would run to her, call her "mommy," and hug her. During visits, they would play in the park, recite the alphabet, count in Spanish, and read together. A.H. would not want the visits to end, and would ask, "Can I go home with you?"

The juvenile court found that mother's recent visits with A.H. were regular, but prior visitation had been "very inconsistent." The court found that "although there is some evidence that A.H. is bonded, it appears to be of the sort that the attachment that occurs in the normal course and not of the kind that case law specified as meeting prong two."

Regarding whether terminating the relationship between mother and A.H. and choosing adoption would be detrimental to

A.H., the court stated:  Specifically, the juvenile court expressly stated:

"And most importantly for the third prong, the court really has looked through the record for more evidence of [mother] playing a parental role, although some limited evidence of that was adduced yesterday through [mother's] testimony, it's not sufficient to meet the parental role requirement of prong three. And the court had initial concerns about that in terms of whether [mother] really was able to.  [¶]  In looking at the history, it does appear that [mother] really did have time and opportunities to separate herself from father in a way that would have allowed for greater liberalization.  And because of her actions, that did not occur.  And so there wasn't an opportunity for that role to be expanded."  The court stated, "[Mother's] continued relationship with father . . . to this day poses a significant and substantial risk to the minor."

The court therefore found the parental beneficial relationship exception to adoption did not apply, and terminated parental rights, designating J.B. as the prospective adoptive parent.

## DISCUSSION

Mother contends the juvenile court erred in terminating her parental rights because (1) no substantial evidence supports the court's finding that mother's visits were inconsistent, (2) the court applied an incorrect legal standard in finding mother had not formed a beneficial bond with A.H., (3) no substantial evidence supported the court's finding that no beneficial bond existed, and (4) the court abused its discretion in finding the benefits of adoption outweighed those of a continued parent-child relationship.  Mother further contends the court erred in

8

terminating her parental rights because DCFS failed to comply with ICWA and related state statutes. We agree with all but the second contention. Therefore, we reverse.

## I. Parental Benefit Exception to Adoption

### A. Applicable Law: *In re Caden C.* (2021) 11 Cal.5th 614

At a permanency planning hearing pursuant to section 366.26 the court is charged with determining a permanent plan of care for a child. If the child is likely to be adopted, adoption is the preferred plan. (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The Legislature has provided an exception to the general rule of adoption where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] . . . [T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citation.] . . . [C]ourts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

In sum, the court "decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the

natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

"When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home. [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

"What's more, understanding the harm associated with severing the relationship is a subtle enterprise—sometimes

depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

The parent challenging the termination of parental rights based on the parent-child relationship exception has the burden of proving that the exception applies. (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

### B.    Standards of Review

We review the juvenile court's determination whether the parent has visited and maintained contact with the child consistently, given the extent permitted by the court's orders, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We likewise review for substantial evidence the court's determination whether the relationship is such that the child would benefit from continuing it. (*Id.* at p. 640.) We may not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts, and will uphold the trial court's determination supported by substantial evidence even if substantial evidence to the contrary also exists. (*Ibid.*)

12

We review whether termination of parental rights would be detrimental to the child for abuse of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.]  But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' (*Id*. at p. 641.)

### C. Application

#### 1. Visitation

Here, the court found that although mother's recent visits with A.H. were regular, prior visitation had been "very inconsistent."  No substantial evidence supports the finding.

On the contrary, DCFS reported that "[v]isits with A[.H.] have been consistent with mother.  Mother has had a few cancellations and sees A[.H.] almost every week," reflecting that mother had 28 visits between March 14, 2019 and September 16, 2019, with two cancelled visits.  And the FFA reported that mother was "consistent in attending visits."

Respondent argues that mother canceled two visits and ended some early.  But both DCFS and FFA nevertheless considered her overall pattern to constitute "consistent" visitation.  Consistency in anything suggests only a settled, regular, predictable pattern, not uniformity of conduct.  Section 366.26 itself requires only "regular," not 100 percent visitation.  (§ 366.26, subd. (c)(1)(B)(i).)  That mother visited A.H. 28 out of 30 times over a period of six months can only be deemed to constitute regular visitation.

13

Respondent suggests that mother's initial deferral of J.B.'s offer of in-person visits supports the court's finding that mother had not regularly visited A.H. We disagree. First, mother was visiting regularly by video conference. That she at first eschewed changing the nature of visitation from virtual to in-person does not vitiate the regularity of the video visits. Second, mother's deferral was reasonable under the circumstances, as she wished to avoid putting her son and his foster family at risk given the pandemic and her housing situation (a single room occupancy with a bathroom shared with other tenants). Nothing suggests such a precaution was irregular or inconsistent with the Welfare and Institution Code's requirement of regular visitation.

We conclude that no substantial evidence supports the juvenile court's finding that mother's visits were inconsistent.

## 2. Beneficial Parent-Child Relationship— Legal Standard

The juvenile court found that "although there is some evidence that [A.H.] is bonded [to mother], it appears to be of the sort that the attachment that occurs in the normal course and not of the kind that case law specified as meeting prong two." The court found little evidence that mother "play[ed] a parental role" in A.H.'s life, and mother's failure to take advantage of "opportunities to separate herself from father in a way that would have allowed for greater liberalization" prevented "an opportunity for [the parental] role to be expanded." The court found that mother's "continued relationship with father . . . poses a significant and substantial risk to the minor."

Mother argues that to classify a relationship as "parental" is to impose a "narrow or rigid definition of the type of

14

relationship," which is impermissible in determining whether the beneficial parent-child relationship exception applies.

We reject the argument's premise:  Rather than narrow or rigid, the adjective "parental" is so broad and flexible as be practically meaningless for determining whether a beneficial relationship exists in any particular instance.  In one sense it suggests simply that one-half of the relationship contains a parent, for good or ill.  "[R]arely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The proper determination here is whether a child has a substantial, positive emotional attachment to a parent. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  An improper determination would be, for example, whether the parent is able to provide for the child's daily needs (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1228-1230) or attend medical appointments and understand the child's medical needs (*In re D.M.* (2021) 71 Cal.App.5th 261).  All three relationships can be fairly characterized as "parental." That the juvenile court here used the conclusory expression "parental" in its findings does not suggest it meant the term in an improper rather than proper sense.

### 3.    Beneficial Parent-Child Relationship— Substantial Evidence

Mother argues that even if the juvenile court applied the proper standard, no substantial evidence supports its finding that she and A.H. did not enjoy a substantial, positive, emotional attachment.  We agree.

The two- or three-year-old A.H. told a social worker that he had visits with "mommy," and during virtual visits said, "Hi mommy," and waved to mother.  He was excited about and looked

15

forward to his visits with mother, and enjoyed playing while mother watched him during the virtual video visits. During in-person visits, A.H. would run to mother, call her "mommy," and hug her. They would play in the park, recite the alphabet, count in Spanish, and read together. A.H. would not want the visits to end, and would ask, "Can I go home with you?" This constitutes substantial evidence of a substantial, positive, emotional attachment between A.H. and mother. No evidence suggests they had a lesser relationship.

Respondent offers no substantial rebuttal, but intimates through a series of incomplete syllogisms that the relationship between mother and A.H. was not ideal. Respondent observes "there were concerns about the interaction being lacking" because some early in-person visits involved watching television or playing video games, but does not go so far as to suggest that watching television or playing games together constitutes a lack of interaction. Respondent observes that sometimes mother would text J.B. when they became frustrated and did not know how to handle A.H.'s tantrums, but does not assert that sometimes reaching out for help constitutes lack of a substantial, positive, emotional attachment. Respondent observes that mother sometimes needed J.B.'s help to hold the two- or three-year-old A.H.'s attention during two-hour long virtual visits, and failed to realize when A.H. was done with a visit, but draws no conclusion from those facts. Respondent observes that mother had a toxic relationship with father, and for reasons of safety chose not to have in-person visits with A.H., but fails to explain how a mother shielding her child from danger negates their positive beneficial relationship.

None of these purported deficiencies constitutes substantial evidence that mother and A.H. enjoyed anything less than a substantial, positive, emotional attachment.  On the contrary, the only probative evidence reflected just such an attachment, and the juvenile court erred in finding the second prong of the beneficial parent-child relationship had not been met.

      **4.     Detriment of Terminating the Relationship**

As to whether terminating the relationship between mother and A.H. and choosing adoption would be detrimental to the child, the juvenile court found that mother did not "play a parental role," that visits were never liberalized because she failed to take advantage of "opportunities to separate herself from father in a way that would have allowed for greater liberalization," which prevented "an opportunity for [the parental] role to be expanded," and that mother's "continued relationship with father . . . poses a significant and substantial risk to the minor."

None of these findings was germane to whether termination of the parent-child relationship would be detrimental to A.H. because "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  In this instance, therefore, the juvenile court applied an incorrect legal standard.

"Review for abuse of discretion is . . . focused not primarily on the evidence but the application of a legal standard."  (*Caden C., supra*, 11 Cal.5th at p. 641.)  A court abuses its discretion when it makes an " ' "arbitrary, capricious, or patently absurd determination,' " i.e., where it " 'exceed[s] the bounds of reason." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

17

To base a finding on an irrelevant factor exceeds the bounds of reason. Accordingly, we need not address whether the juvenile court abused its discretion in weighing the harm of severing the parent-child relationship to the benefits of a new adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

## II. ICWA

Mother contends no evidence in the record indicates DCFS asked any extended relatives about A.H.'s possible Indian child status, in derogation of state law (§ 224.2) implementing ICWA and contrary to the requirement that the department make and document such inquiries and any responses. (See Cal. Rules of Court, rule 5.481, subd. (a)(5) [burden on child welfare agency to provide detailed requirements of the ICWA have been satisfied is appropriate]; *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) Therefore, mother argues, the juvenile court lacked the power to terminate her parental rights.

Respondent concedes that section 224.2 was not followed, but argues the error was harmless because the parents denied any Native American ancestry.

For reasons stated in our recent opinion in *In re A.C.*, (B312391, Mar. 4, 2022) __ Cal.App.5th __ [2022 WL 630860], we disagree that the error was harmless. We will therefore remand the matter for a further ICWA inquiry.

18

## DISPOSITION

The order terminating mother's parental rights is reversed. The case is remanded to the trial court to order compliance with Welfare and Institutions Code section 224.2. The juvenile court shall order that within 30 days of the remittitur, DCFS report its investigation of A.H.'s potential Indian ancestry by interviewing available extended family members.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

VOGEL, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19